Jason R. Harrington, Esq.
Harrington & Gokhale PLLC
244 Fifth Avenue, Suite J207
New York, NY 10001
Tel: (212) 739-9270
Fax: (212) 739-9270

*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMESH SARVA, individually and as shareholder of KINGMAN KIDNEY CLINIC, INC.; KINGMAN KIDNEY CLINIC, INC., an Arizona corporation,<br><br>               Plaintiffs,<br>      v.<br><br>VIJAY PALANICHAMY, an individual and officer of KINGMAN KIDNEY CLINIC, INC.,<br><br>               Defendants. | Case No.   16-cv-5874<br><br><br>**COMPLAINT** |

Plaintiffs, Ramesh Sarva individually and as a shareholder, and Kingman Kidney Clinic, Inc. ("Plaintiffs") directly as a corporation, by and through their attorneys, Harrington & Gokhale PLLC, alleges the following, on information and belief:

### NATURE OF THE ACTION

This action arises as a result of Defendant Vijay Palanichamy's ("Chamy") repeated failures to maintain state and federal compliance and ensure that essential quality controls were in place during the operation of the Plaintiff kidney dialysis center, Kingman Kidney Clinic, Inc. ("Clinic").  Because of Defendant's lack of action the Clinic was shutdown by the Arizona Department of Health citing that the Clinic put patients in immediate jeopardy of harm.

The thought of building and operating a kidney dialysis center began in 1999 when Chamy, a

licensed nephrologist, moved to Kingman, Arizona to start a nephrology practice. At the time, there was only one dialysis clinic in the immediate area - Kantor and Gross, P.C. ("K&G P.C."). Though Chamy had his office in the same town, K&G P.C. refused to grant Chamy any access privileges to its clinic. In other words, once Chamy treated patients for kidney issues at his office, he could not tend to them at the center owned by K&G P.C., which resulted in bitter feelings and a loss of potential revenue for Chamy.

To address this problem, Chamy turned to Plaintiff Ramesh Sarva ("Sarva"), an established dialysis-facility owner, for assistance. Sarva agreed to help and initially tried to negotiate a purchase of K&G P.C. at Chamy's request. That was unsuccessful. Sarva and Chamy then agreed to open a *de novo* kidney dialysis clinic. Sarva contributed $100,000.00 in capital, while Chamy contributed $300,000.00, for the purpose of building a clinic and preparing it for the painstaking process of licensure – which was (and continues to be) heavily regulated by the Arizona Department of Health[1] and the Center for Medicare and Medicaid Services ("CMS")[2]. Sarva, being an experienced businessman in opening and operating clinics, was familiar with each department's rules and regulations. On May 1, 2000, the Clinic obtained its license and was now a fully operational kidney dialysis treatment center which would provide services to those suffering from End Stage Renal Disease ("ESRD"). Once opened, Chamy served as the medical director and facility administrator of the Clinic charged with ensuring that the Clinic complied with the strict state and federal guidelines which required rigorous compliance and perfect execution of quality controls.[3]

Unfortunately, Chamy failed in his duties. After years of declining operations, a large part due to the fact that the defendant repeatedly failed to implement quality controls, the Clinic was forced to close in September 2015 for putting patients in immediate jeopardy of harm. At that time, Chamy (a principal of the corporation), instead of focusing on re-opening the Clinic, poached each and every patient (over 50) of the Clinic and moved them to another, competing dialysis treatment center, in direct violation of

---

[1] Arizona Arizona Administrative Code Title 9, Chapter 10
[2] 42 CFR Parts 405, 410, 413, 414, 488, and/or 494
[3] The Clinic quickly grew and was treating more than 80 patients a week. Other large, industry-related companies, such as Fresinius, took notice of the growth and made offers to purchase the Clinic. Each time, Chamy refused citing reasons such as the potential purchasers' poor quality of work.

his duties as a principal, medical director, and facility administrator of the Clinic. Despite Sarva's efforts to remedy the situation and seek Chamy's assistance in re-opening the Clinic, Chamy has created opposition along the way and has turned his back on the Clinic - even knowing that the shutdown of the same falls solely on his shoulders.

Plaintiffs, now, seek damages in excess of $3,900,000.00 as a result of, amongst others, Chamy's negligence, breach of contract, and breach of fiduciary duties.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332 as there is complete diversity of citizenship between Plaintiffs and Defendants in this matter and the amount in controversy exceeds $75,000 exclusive of interest and cost.

2. Venue is proper in this District pursuant to 28 U.S.C. §1391 as a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

3. Venue is also proper in this District pursuant to 28 U.S. Code §1401. Furthermore, per Rule 23.1 of the FRCP as Sarva was (and still is) a shareholder at the time of the actions complained of; the action is not a collusive one to confer jurisdiction; and Sarva attempted on multiple occasions to call, email, and visit Chamy in order to obtain the necessary action, but was met with very little reception.

## PARTIES

4. Plaintiff Kingman Kidney Clinic, Inc. ("Clinic") owns and operates a hemodialysis treatment center that provides dialysis services for patients suffering from chronic kidney failure, commonly known as End Stage Renal Disease, or ESRD. The Clinic is a privately held corporation duly organized and existing under the laws of the State of Arizona, with its corporate headquarters located at 43-33 48th Street, BSMT, Sunnyside, NY 11104 and its principal place of business located at 4055 Stockton Hill Road, Suite 15-17, Kingman, Arizona 86409.

5. Plaintiff Ramesh Sarva ("Sarva") is an individual and current shareholder of the Clinic and has continuously held his Clinic stock at all relevant times. Sarva resides in the State of New York. Sarva, as an individual, has made several large loans to the Clinic, that were to be paid back when

business became more viable.  Part of Sarva's livelihood revolves around opening, operating and selling fully operational kidney dialysis centers to larger corporations. Sarva's injuries as a shareholder are separate and distinct from that suffered by any other shareholder or those suffered by the Corporation, as alleged in more detail below.  Sarva was also an officer and director of the Corporation, serving as President and CEO.

6. Defendant Vijayavel Palanichamy, M.D ("Chamy") is a board-certified physician specializing in Nephrology, a field of medicine involving the treatment of kidney diseases and conditions, and is experienced in the administration of hemodialysis centers.  Chamy is a shareholder and principal officer of the Corporation and serves as Medical Director and Chief of Staff with patient-admitting privileges at the Clinic.   Upon information and belief, Defendant is an individual residing in the State of Arizona, County of Mohave.

## FACTUAL ALLEGATIONS

### I. What is Kidney Disease and End Stage Renal Disease?

7. Kidneys have important roles in maintaining health.  When healthy, the kidneys clean the body's blood by maintaining an internal equilibrium of water and minerals.  When kidneys fail, however, patients either need a transplant or frequent treatment to replace the work that the now-failed kidneys once did.

8. Chronic kidney disease is a progressive disease that ultimately destroys the kidney's ability to process and clean blood.  The loss of kidney function is normally irreversible.  End Stage Renal Disease is a disease characterized by a near total loss of function of the kidneys.

9. Patients suffering from ESRD typically undergo a procedure called hemodialysis, a life-sustaining treatment that replaces the function of the kidneys by removing toxins and excess fluid from the blood. Those treated generally require dialysis at least three times per week for the rest of their lives and understandably seek treatment at centers near their home or work.

### II. State and Federal Regulations Governing Kidney Dialysis Centers

10. Since 1972, the federal government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program, regardless of age or financial circumstances.

4

Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests and medications. Other government-funded healthcare programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

11. In exchange for universal payment coverage, the federal government sets forth very rigorous standards for each dialysis center. These regulations[4] include, but are not limited to:

- Developing and implementing extensive clinical policies and procedures which govern, to name a few, human resources, emergency management, infection prevention and control, leadership, medication management, patient care, rewards management and care, and treatment provisions;
- Developing, implementing extensive technical policies and procedures which govern, to name a few, water purity, chemical injection, microbial monitoring, patient reaction, and ultrafiltration;
- Conducting daily, weekly, and monthly quality assurance meetings; and
- Ensuring each staff member is up-to-date with all necessary state and federal licenses and credentials.

Medicare requires each dialysis clinic to operate under a nephrologist, who will act as a medical director. The staff of each center typically consists of registered nurses, licensed practical or vocational nurses, patient care technicians, a social worker, a registered dietitian, biomedical technician support and other administrative and support personnel.

**III. Opening of the Clinic**

12. During his course of ownership of other non-related clinics, Sarva was approached by Chamy to open a dialysis clinic in Kingman, Arizona.

13. On July 29, 1998, Sarva entered into a joint business venture with Chamy to form a closely held corporation known as Kingman Kidney Clinic, Inc. because of the high market demand in Kingman, Arizona, as the nearest dialysis centers at the time were located over 100 miles away in either

---

[4] Arizona Administrative Code Title 9, Chapter 10 and 42 CFR Parts 405, 410, 413, 414, 488, and/or 494

5

Las Vegas, Nevada or Phoenix, Arizona. Importantly, this new center would be in close proximity to Chamy's Nephrology practice.

14. The agreement provided that Sarva would build the Clinic and contribute $100,000 and own 30% of the corporate stock, as a principal; Chamy would contribute $300,000, own 25% of the corporate stock, as a principal and collect a salary as the medical director and facility administrator; and the remaining stock would be held for a group of investors led by Chamy. Chamy, however, never brought a group of investors.

15. On November 19, 1999, Chamy was to begin his service as the medical director and facility administrator of the clinic. In those roles, Chamy was responsible, amongst others, for:
- Developing and implementing extensive clinical policies and procedures which govern, to name a few, human resources, emergency management, infection prevention and control, leadership, medication management, patient care, rewards management and care, and treatment provisions;
- Developing, implementing extensive technical policies and procedures which govern, to name a few, water purity, chemical injection, microbial monitoring, patient reaction, and ultrafiltration;
- Conducting daily, weekly, and monthly quality assurance meetings;
- Ensuring each staff member is up-to-date with all necessary state and federal licenses and credentials; and
- Generating new business.

16. On May 1, 2000, Medicare approved Clinic as an ESRD provider and approved it to receive payment for dialysis services and supplies to Medicare-eligible ESRD patients.

## IV. The Downfall

17. Since 2003 or 2004, the Clinic incurred losses every year. Sarva personally loaned additional monies to the Clinic to keep it in full operation.

18. In or about 2013, a large competitor, Fresinius, approached Sarva to purchase the Clinic. Despite the Clinic operating at a loss for approximately a decade, Chamy refused to agree to sell to

6

Fresinius. Although Sarva was eager to minimize his own as well as the corporation's financial losses, Chamy assured him that he would perform better and also increase the Clinic's patient base to increase revenue with the goal of later selling the Clinic to a larger franchise of dialysis clinics. Sarva relied on Chamy's assurances.

19. Due to Chamy's opposition to selling, Fresinius subsequently opened a new clinic of its own in the same area in direct competition with the Clinic, thus causing even more revenue loss to the Clinic.

## V. Chamy's Mistakes Come to a Head

20. On September 4, 2015, the Arizona Department of Health Services commenced an unannounced survey of the Clinic facility and found that the Clinic was in violation of conditions of participation in the Medicare program and that the Clinic's deficient practices put patients in immediate jeopardy and harm. As a result, the Arizona Department of Health issued a shutdown order and CMS subsequently cancelled the Clinic's approval for ESRD coverage on September 30, 2015.

21. The Department of Health and CMS survey found serious and pervasive problems with standards of the Clinic and the Clinic's medical staff, including Chamy as the medical director, who was solely responsible for the complying with the rules and regulations.

22. After losing the Clinic's operational license, Chamy exhibited a chronic failure to act prudently in responding to the results of the audit which shut down the Clinic. More importantly, he repeatedly failed to bring the Clinic into compliance with the Arizona Department of Health and CMS.

23. During this time Chamy ignored Sarva's phone calls and emails inquiring about the shut down and the license revocation. Prior to the audit, Sarva had no knowledge of the condition of the Clinic because he was assured by Chamy that the Clinic was operating with no issues and in compliance with all applicable laws.

24. To minimize his and the corporation's losses, Sarva approached several entities to purchase the Clinic, but each one refused because the clinic was no longer approved under state, federal, and CMS guidelines.

25. Sarva then arranged to meet with Chamy at the Clinic to inspect the facility, review the

7

required protocols and establish a uniform strategy to get the Clinic back in compliance. Chamy refused to participate in these discussions, despite being solely responsible for the violations committed as the medical director and facility administrator.

26. Once the Clinic was forced to close its doors, it was discovered that Chamy moved his patients to the nearby Fresinius clinic and, thus, suffered no loss of income and effectively abandoned his duties and contractual obligations with Plaintiffs.

27. Further, Sarva personally loaned and/or guaranteed funds to the Clinic totaling approximately $3,900,000.00 to which Chamy unjustly benefitted from by writing off his 25% share of cumulative losses which amounted to a tax savings of approximately $400,000. Thus, Chamy was able to recover his entire investment of $300,000 while maintaining his annual income from treating patients when he moved them to the nearby clinic.

28. Chamy's purposeful and intentional failure to implement internal policies or protocols has cost Clinic and Sarva to lose approximately $3,900,000.00 in revenue.

## FIRST CAUSE OF ACTION

### (Breach of Fiduciary Duties)

29. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 28 as if more fully set forth herein.

30. As an Officer of the Clinic, Chamy was in a fiduciary relationship with Plaintiff. He owed the Clinic and its co-shareholders the fiduciary duties of candor, good faith, and loyalty in the management and administration of the Clinic's business and affairs.

31. To discharge his duties, Chamy was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Clinic. By virtue of such duties, Chamy was required to do, among other things:

    a. Ensure that the Company complied with its legal obligations and requirements under Arizona Administrative Code Title 9, Chapter 10 and 42 CFR Parts 405, 410, 413, 414, 488, and/or 494;

    b. Conduct the affairs of the Company in an efficient, business-like manner so as to make it

      possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   c. Remain informed as to how the Clinic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

   d. Ensure that the Company operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

32. Chamy engaged in misconduct by, among other things, engaging in a sustained and systematic failure to exercise his oversight responsibilities and to ensure that the Clinic complied with applicable laws, rules, and regulations required for CMS coverage and Arizona Department of Health compliance.

33. Because the entire portion of the Clinic's revenues derived from its Medicare-approval to provide ESRD services to patients, Chamy knew or should have known that it would be devastating for the company and the shareholders if the company were to lose its Medicare approval. Accordingly, the Clinic's viability completely depended upon its ability to stay in compliance with Medicare regulations. Any revelations that the Clinic was not in compliance with Medicare rules would directly undermine its ability to treat current patients, obtain new patients, or attract potential buyers from larger franchises.

34. Chamy's duty of loyalty included, among other things, the obligation to refrain from using his position to gain personally from business opportunities belonging to the Clinic. Upon information and belief, Chamy hatched a plan to for himself which involved refusing to sell the Clinic to Fresenius, while simultaneously causing the Clinic to become out of compliance, and then ultimately taking these patients to the nearby Fresenius center anyway.

35. Chamy breached his duties of loyalty and good faith by, among other things, intentionally failing to remedy serious instances of noncompliance found by Arizona's Department of Health Services, including serious violations that posed immediate jeopardy to the health and safety of patients, as well as failing to make a good faith effort to establish and maintain necessary, internal,

operational controls.

36. Sarva and the Clinic have suffered, and will continue to suffer, damages as a direct and proximate result of Chamy's breach of fiduciary duties, including but not limited to, damages associated with the Clinic's legal costs, potential legal liability, loss of patients, loss of revenues, increased regulatory oversight, and loss of credibility in the market.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

37. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 36 as if more fully set forth herein.

38. On November 19, 1998, Sarva and Chamy entered into an agreement that defined the role and responsibility of his position as the medical director.

39. Chamy breached his duties under the agreement by failing to, among other things, develop, implement, and maintain the required clinical and technical policies and procedures as required by Arizona Administrative Code Title 9, Chapter 10 and 42 CFR Parts 405, 410, 413, 414, 488, and/or 494.

40. Particularly, Chamy breached his duties under the consulting agreement by failing to, among other things, maintain the requirements of the Medicare ESRD program as the Medical Director; failing to ensure the Clinic's compliance with all state and federal regulations governing the medical standards of dialysis treatment centers; and by failing to implement policies or protocols regarding self-care dialysis training and backup, patient education, scheduling patients for treatment, scheduling medical coverage for all hours of the clinic's operation and around the clock on-call services, staff in-service training, and other aspects of medical record keeping, laboratory, billing, collection, public relations, insurance, cash management, scheduling and hours of operation.

41. Sarva and the Clinic have suffered, and will continue to suffer, damages as a direct and proximate result of Chamy's breach of contract, in an amount to be determined at trial, but believed to exceed $3,900,000.00.

## THIRD CAUSE OF ACTION

**(Breach of Non-Compete Agreement)**

42. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 41 as if more fully set forth herein.

43. Sarva and Chamy executed an agreement in 1998 with a covenant not to compete. The provision barred Chamy from treating any patients at any other dialysis center within a 50-mile radius for a period of three years.

44. Chamy breached the covenant not to compete when he moved his patients to Fresenius and continued to treat and care for them at their nearby clinic after abandoning his obligation with Plaintiffs.

45. Sarva and the Clinic have suffered, and will continue to suffer, damages as a direct and proximate result of Chamy's breach of the non-compete agreement, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**

**(Unjust Enrichment)**

46. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 45 as if more fully set forth herein.

47. A shareholder of a corporation, such as the Clinic, may deduct his proportionate share of losses passed through to him from the corporation. Chamy was thus able to recover his entire investment in the Clinic while maintaining his annual salary income for treating patients.

48. In particular, Chamy received $4,200.00 a year per patient as salary. Each year the Clinic had between 50 and 90 patients which translated to a $210,000.00 to $378,000.00 annual salary, depending on the year. While Chamy was receiving this salary, the Clinic was losing money as a whole, to which Sarva was obligated to lend money to balance those losses.

49. By his wrongful acts and omissions, Chamy was unjustly enriched at the expense of and to the detriment of Sarva and the Clinic.

50. Sarva seeks restitution from Chamy and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Chamy, which otherwise would leave him

unjustly enriched.

51. Sarva, as an individual shareholder, seeks restitution and disgorgement of Chamy's income earned from intentionally or negligently allowing the Clinic to close.

## FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

52. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 51 as if more fully set forth herein.

53. Chamy induced Sarva to initially invest $100,000.00 in capital to start the Clinic as well loan additional monies throughout the years to overcome the Clinic's operating losses based on Chamy's representation that he would oversee the Clinic's day-to-day management and grow the business.

54. Sarva reasonably relied on Chamy's promises to his significant detriment when he personally loaned the aforementioned funds to the Clinic .

55. Sarva's reasonable reliance on Chamy's promises and duties to the Clinic has proximately and directly caused Sarva damages in an amount to be determined at trial, but estimated to be in excess of $3,900,000.00.

## SIXTH CAUSE OF ACTION
### (Conversion of Corporate Assets)

56. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 55 as if more fully set forth herein.

57. Plaintiff Chamy appropriated the Clinic's patients to another local clinic after causing the Clinic to shut down.

58. Sarva's reasonable reliance on Chamy's promises and duties to the Corporation has proximately and directly caused Sarva damages in an amount to be determined at trial, but estimated to be in excess of $3,900,000.00.

## SEVENTH CAUSE OF ACTION
### (Negligence)

59. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 58 as if more fully set forth herein.

60. As medical director, Chamy owed a duty to Sarva and the Clinic. Those duties, included, among other things, develop, implement, and maintain the required clinical and technical policies and procedures as required by Arizona Administrative Code Title 9, Chapter 10 and 42 CFR Parts 405, 410, 413, 414, 488, and/or 494. Chamy knew or should have known that if these duties are not performed, the Clinic loses its license to practice.

61. Chamy breached his duties thereby causing the Clinic to be in violation and shut down by the Arizona Department of Health.

62. But for Chamy's failure to perform his duties properly, the Clinic would have continued operations.

63. Sarva and the Clinic have suffered, and will continue to suffer, damages as a direct and proximate result of Chamy's negligence in an amount to be determined at trial, but believed to exceed $3,900,000.00

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

1. An award of compensatory damages in an amount to be shown exceeding $3,900,000.00;

2. Extraordinary equitable or injunctive relief as permitted by law, equity, and state statutory provisions, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendant's assets so as to assure that Plaintiff on behalf of the Corporation has an effective remedy;

3. Disgorgement of all profits, benefits, and other compensation obtained by Defendants in favor of the Corporation;

4. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountant's and expert's fees, costs, and expenses;

5. Granting such further and other relief as this Court deems just and proper.

### REST OF PAGE INTENTIONALLY LEFT BLANK

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial in this case.

RESPECTFULLY SUBMITTED this 21st day of October, 2016.

                          **HARRINGTON & GOKHALE PLLC**

          By:    /s/ Jason R. Harrington
                      Jason R. Harrington, Esq.
                      *Attorney for Plaintiffs*

## VERIFICATION

I, Ramesh Sarva, am the duly authorized agent of the Plaintiffs in this matter. I have read the Complaint set forth above, and the facts stated in the Complaint are true of my own personal knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and that I signed this verification on October 21, 2016 in New York, New York.

By: _Ramesh Sarva_
Ramesh Sarva